Lizzie **WILLIAMS**, Plaintiff,

v.

Otis **BOWEN**, Secretary of Health and Human Services, Defendant.

No. 86C6934.

United States District Court, N.D. Illinois, E.D.

July 9, 1987.

Eugene C. Edwards, Cook County Legal Assistance Foundation, Harvey, Ill., for plaintiff.

Gail C. Ginsberg, Asst. U.S. Atty., Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Lizzie Williams ("Williams")[1] seeks judicial review of a final decision by the Secretary of Health and Human Services ("Secretary") denying Williams' claim for disability insurance and supplemental security income ("SSI") benefits under Social Security Act ("Act") §§ 216(i), 223 and 1602, 42 U.S.C. §§ 416(i), 423 and 1381a[2] (a claim based on an asserted disability beginning in February 1981). After an October 24, 1985 hearing (the "Hearing"), Administrative Law Judge ("ALJ") Dale McLaughlin denied Williams' application April 18, 1986. Williams then exhausted her administrative remedies in proper sequence and brought

this action against Secretary under Section 405(g).

As invariably occurs in these actions, which come to this Court on the administrative record and a decision by Secretary, the parties have filed cross-motions for summary judgment. In the alternative, Williams has asked for a remand to Secretary. For the reasons stated in this memorandum opinion and order, both parties' motions for summary judgment are denied, and this case is remanded to Secretary for further proceedings consistent with this opinion.

### Facts

Williams, who was 45 years old at the time of the Hearing, has a tenth-grade education. Her last prior work had been a 15–year job (from 1966 until 1981) with GTE. There she initially worked on an assembly line making circuit boards for various types of electronic devices. Later she was switched to repairing circuit boards that had been rejected by inspectors (R. 34–38). That work involved a number of physical job requirements:

1. It had to be done both in standing and sitting positions.

2. It involved occasional lifting and carrying of baskets containing circuit boards. Williams testified those baskets weighed as much as 50 pounds (R. 35).

3. It required a certain degree of hand dexterity and frequent bending (R. 139–40).

Williams left her job in February 1981 because of pain and a high fever (R. 39), and she has not worked since then. Doctors determined her pain and fever were caused by a collapsed kidney, and Williams' right kidney was surgically removed March 24, 1981. Although she has recovered satisfactorily from that surgery, she continues to suffer from "recurrent urinary tract infections" (R. 375).

---

1. Williams used the name Lizzie Porter for a short time (R. 173), and that name appears on some of the medical reports in the record (see, e.g., R. 360–69).

2. All further citations to provisions of the Act will take the form "Section—," referring to the Title 42 numbering rather than to the Act's internal numbering. Regulations drawn from 20 C.F.R. will be cited "Reg. §—" or "Rule—."

Despite her recovery, Williams was hospitalized two more times in 1981 and once in 1982. In August 1981 Williams was admitted to the hospital with back pain. Efforts to find the source of that pain were unsuccessful. All her x-rays and tests were negative (R. 346–55). Williams entered the hospital again in November 1981 suffering from palpitations and fluttering of the heart. Her initial EKG showed bigeminy and multiple, premature ventricular contractions (PVCs). Following medication her later EKGs and ECG were normal (R. 360). In May 1982 Williams was again hospitalized with chest pain and dizziness. All tests at that time were negative.

After her fourth hospital stay Williams applied for SSI benefits June 11, 1982, claiming she was disabled because of "kidney trouble, back problem, heart condition, right leg goes out on me" (R. 54). That application was denied. Williams then unsuccessfully applied for both SSI and disability insurance benefits in March 1983, claiming similar impairments (R. 67, 76). Nothing daunted, she filed her present applications June 11, 1984, listing "kidney problem, back trouble, right side numb" as the causes of her claimed disability (R. 99, 109). Those applications were denied for the same reason her prior applications had been: Medical evidence assertedly showed she was still able to do her former work of assembling and repairing circuit boards (R. 123–24). After the most recent denials, Williams requested a hearing before an ALJ.

At the Hearing Williams appeared pro se and was the only person to testify. She listed a number of reasons she cannot work: pain in her lower back, right leg and hand, swelling in her feet and hand, dizziness, chest pain and generalized stiffness (R. 44). She does not drive and needs help bathing and dressing. She claimed she walks with a cane because she often falls "when [her] right leg [goes] out on [her]" (R. 46). She regularly takes medication for her back and leg pain, urinary tract infections, high blood pressure and dizziness, and she has nitroglycerin to relieve her chest pain (R. 46–48, 278).

In addition to Williams' testimony and the medical records from her hospital stays, ALJ McLaughlin had before him reports from several treating and consulting physicians. Their evaluations of Williams' impairments varied somewhat.

Dr. Patel, Williams' primary treating physician from 1980 to the present, prepared a five-page evaluation of her medical condition and also filled out Secretary's standard form for assessing an individual's ability to do work. Dr. Patel found Williams to be suffering from several distinct but related impairments:

1. recurrent urinary tract infections causing back pain and uretic colic,

2. chest pain due to angina pectoris for which patient occasionally takes nitroglycerin,[3]

3. anemia which is mostly secondary to the urinary tract infections and which can be remedied by a proper diet,

4. chronic low back syndrome secondary to arthritis of the thoracic and lumbar spines, both knees and both ankles,[4]

5. dizziness of unknown origin,

6. obesity which is a contributing factor to her chest, back, knee and ankle pain, and

7. hypertension controlled by medication.

Despite those "chronic problems," Dr. Patel inexplicably checked the boxes on the form (R. 379) indicating Williams' myriad difficulties had *no* effect on her ability to lift/carry and stand/walk. That mystery is deepened by Dr. Patel's inconsistent report that Williams could sit for only 30–45 minutes at a time and could not climb, balance, stoop or crouch (R. 379). He believed her ability to reach, handle, push or pull was also impaired (R. 380).

---

**3.** In his report Dr. Patel refers to a Dr. Chuquemia. Dr. Patel claims that doctor agrees with his assessment that Williams' chest pains are typical of angina, but the record contains no report from a Dr. Chuquemia.

**4.** Dr. Patel refers to x-rays from a 1983 hospital stay to support his diagnosis. No such evidence (either the x-rays or even a record of a 1983 hospital stay) appears anywhere in the record.

Dr. Uppuluri, to whom Williams was referred for her kidney problems, also prepared an assessment of her ability to work. He found she could frequently lift 20–30 pounds, while her ability to stand, walk, sit, reach and push or pull might occasionally be impaired (R. 372–73). Dr. Uppuluri noted, however, that he had last seen Williams in 1984 and specifically deferred to Dr. Patel for a more up-to-date evaluation.[5]

Dr. Elmes treated Williams for her back and leg pain. He too had not seen Williams since 1984 (R. 370). He reported she then complained of low back pain radiating to her right side, numbness in her right leg and hand and cramping of her big toe. His examinations of Williams found some tenderness in the midline area of her lower back and some pain with extreme range of motion. Otherwise her neurological exams were negative, and x-rays of her spine were normal. Dr. Elmes diagnosed Williams' pain as being caused by lumbar fascitis with intraspinous ligamentitis. He prescribed informal physical therapy, a lumbosacral corset and Equanil as needed (R. 236–38, 246–49). He did not tell Williams to use a cane. Dr. Elmes offered no opinion on Williams' ability to do work.

Four consulting physicians also examined Williams in conjunction with her applications for disability benefits. Their findings were generally (but not wholly) similar.

First, Dr. Lester saw her April 19, 1983, essentially finding very little wrong with Williams. He noted her frequent urinary tract infections but foresaw no long-term difficulties in that respect. Williams' EKG and x-rays of her back were negative. She had a full range of motion in all joints, and Dr. Lester believed her blood pressure could be controlled by medication (R. 205–08).

One month later Williams was examined by Dr. Shepard, who gave her an EKG and treadmill test. Her EKG was normal, but she was unable to finish the treadmill test because of dizziness and pain in her right leg. Dr. Shepard diagnosed "possible peripheral vascular disease" (R. 219).

Next Dr. Noetzel saw Williams July 10, 1984. That third doctor found Williams' hypertension was well-controlled, while her chest pain was not typical of angina. Dr. Noetzel did note Williams had a limited range of motion in her spine and had difficulty getting off the examining table and walking on her heels and toes. Dr. Noetzel diagnosed degenerative joint disease of the lumbar spine, but she stated Williams did not need to use a cane (R. 253–55).

Finally Dr. Long saw Williams January 30, 1985. Dr. Long found no basis for Williams' chest pain or dizziness and also believed her hypertension was well controlled and therefore not a problem. Dr. Long noted Williams walked with a right limp and had a limited range of motion in her spine. Dr. Long offered no opinion on Williams' ability to work (R. 266–68).

*Applying the Statutory Framework*

To establish entitlement to disability and supplemental security income benefits, a claimant must show he or she is "disabled." Sections 416(i)(1) and 423(d) define "disability" as:

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months....[6]

Secretary has promulgated extensive procedural regulations for determining whether an applicant is disabled. *Garfield v. Schweiker*, 732 F.2d 605, 607 n. 2 (7th Cir.1984) summarizes Secretary's five-step test for determining "disability":

The following steps are addressed in order. (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to

---

5. Dr. Uppuluri's assessment is apparently limited to the effect of Williams' kidney and urinary tract problems (the only ones he was treating) on her ability to work.

6. Section 1382c(a)(3)(A)'s definition is essentially the same.

perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. § 404.1520 (1983).[7]

Once a claimant has demonstrated an impairment of sufficient severity to prevail at step 4, *Smith v. Schweiker,* 735 F.2d 267, 270 (7th Cir.1984) teaches:

> The burden then shift[s] to the agency to show the claimant retained the residual functional capacity to perform other work in the national economy.[8]

At that fifth and final step Secretary must consider all the claimant's physical and mental impairments (Regs. §§ 404.-1561, 416.961), the claimant's age (Regs. §§ 404.1563, 416.963), education (Regs. §§ 404.1564, 416.964) and work experience (Regs. §§ 404.1565 and .1568, 416.965 and .968).[9] Toward that end the ALJ typically looks to the "Grid," medical-vocational guidelines (found at 20 C.F.R. Subpart P, Appendix 2) that balance the claimant's physical limitations against the other relevant factors (Regs. §§ 404.1569, 416.969).[10] Before doing so the ALJ must determine what type of work a claimant is capable of performing in light of his or her impairments. Secretary's regulations define types of work using physical exertion criteria (Regs. §§ 404.1567, 416.967). Alternatively the ALJ may base the step 5 determination on other evidence, including the assessment of a vocational specialist (Regs. §§ 404.1566(e), 416.966(e)).

In all events, Secretary's decision must be upheld unless (1) the findings are not supported by substantial evidence or (2) Secretary has applied incorrect legal standards (Sections 405(g) and 1383(c)(3)). *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938), has defined "substantial evidence" as:

> such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

### Secretary's Decision

After outlining the relevant law (that is, explaining the five-step disability test), ALJ McLaughlin's decision proceeded under the heading "Summary and Evaluation of the Evidence." As even a cursory reading of the decision reveals, the ALJ put much more effort into summarizing the evidence than he did in evaluating it. His decision contains over four and one-half pages of a generally accurate factual summary (R. 14–18), followed by four short paragraphs of evaluation (R. 18–19):

> Although the claimant did have an acute situation in 1981, i.e. hydroureteronephrois [sic] with right lower uretral [sic] stone in nonfunctioning kidney, it did not last for 12 continuous months. She was hospitalized in August 1981 and November 1981 but these were unrelated to her prior kidney problems. Her back pain has not affected her ability to work for

---

7. *Johnson v. Heckler,* 769 F.2d 1202, 1209–13 (7th Cir.1985) invalidated step 2 of that formulation. ALJ McLaughlin therefore did not use that step in evaluating Williams' alleged disability (R. 14). In *Bowen v. Yuckert,* — U.S. —, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987) the Supreme Court upheld the validity of step 2, reversing an opinion by the Ninth Circuit that had reached the same result as *Johnson.* On June 16 the Supreme Court therefore vacated and remanded *Johnson,* — U.S. —, 107 S.Ct. 3202, 96 L.Ed.2d 690.

8. Sections 423(d)(2)(A) and 1382c(a)(3)(B) define "work which exists in the national economy" as "work which exists in significant numbers either in the region where [the claimant] lives or in several regions of the country." Secretary must ignore existing economic conditions and actual hiring practices and focus solely on the claimant's physical and mental ability to perform jobs that exist in the national economy.

9. See Sections 423(d)(2)(A) and 1382c(a)(3)(B).

10. Because ALJ McLaughlin found Williams was able to perform her past work at step 4, he did not need to go on to a step 5 finding. *Garfield,* 732 F.2d at 607 n. 2.

12 continuous months and her heart problems have resolved.

From December 1981 until April 1983 there is no indication that the claimant sought any continuing medical treatment. As of April 19, 1983, the consultative examiner Dr. Lester reported that although she had undergone a nephrectomy there had been no resulted [sic] long term difficulty (Exhibit 37 page 3). Her hypertension was controlled by Dyazide and although she had complained of chest pain, a subsequent electrocardiogram in June, 1983 was normal. (Exhibit 40)

In February 1986 the claimant's treating physician Dr. Uppuluri incated [sic] that she could lift and carry a maximum of 40 pounds and frequently lift and carry up to 30 pounds. She could occasionally stand, walk, and sitting was not affected by her problems. (Exhibit 76) Her treating physician Dr. Patel (Exhibit 77) indicated that her lifting, carrying, standing, and walking were not limited.

Considering the residual functional capacity assessments [sic] by the claimant's treating physicians Dr. Uppuluri and Dr. Patel, I am convinced that she is capable of performing her past relevant work. Her complaints of multiple problems causing inability to work are not persuasive. Since the claimant is able to perform her past relevant work, she is not disabled within the meaning of the Social Security Act.

That in turn led ALJ McLaughlin to these findings (R. 19):

3. The medical evidence establishes that the claimant has back pain and kidney problems, but that she does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4. The claimant's subjective complaints with regard to pain and restricted or limited daily activities are not supported by the objective medical evidence.

5. The claimant has the residual functional capacity to perform work-related activities except for work involving lifting or carrying more than 50 pounds (20 CFR 404.1545 and 416.945).

6. The claimant's past relevant work as assembler did not require the performance of work-related activities precluded by the above limitation(s) (20 CFR 404.1565 and 416.965).

7. The claimant's impairments do not prevent the claimant from performing her past relevant work.

*Effective Review*

Williams now attacks several of the ALJ's findings. She argues:

1. ALJ McLaughlin's finding of no medical equivalence is not supported by substantial evidence.

2. His finding Williams could return to her past work is not supported by substantial evidence.

3. ALJ McLaughlin applied the improper legal standard when evaluating her subjective complaints of pain.

Secretary takes issue with all Williams' contentions of error. His memorandum suggests several plausible explanations for the ALJ's findings and points to evidence in the record to support those findings. Those explanations and that evidence might well indeed support ALJ McLaughlin's decision, but the problem with Secretary's argument is that those things come from what Secretary's lawyer now says in this case, *not* from what the ALJ said about what he did. Secretary's argument is really based on pure speculation.

■ Although judicial review of Secretary's decisions is (and properly should be) limited, this Court remains obligated to determine whether in fact (1) ALJ McLaughlin considered all the relevant medical evidence, (2) his resolution of conflicting factual matters is supported by substantial evidence and (3) that resolution was obtained using correct legal standards (*Delgado v. Bowen,* 782 F.2d 79, 82–83 (7th Cir.1986) (per curiam)). To permit a proper discharge of that obligation, one more requirement must be met (*Bauzo v. Bowen,* 803 F.2d 917, 923 (7th Cir.1986)):

In addition, the reasons for the ALJ's conclusions must be stated in a manner sufficient to permit an informed review.

No court should be forced to engage in speculation as to the reasons for an ALJ's decision (*Owens v. Heckler*, 748 F.2d 1511, 1516 (11th Cir.1984)). If the decision on its face does not adequately explain how a conclusion was reached, that alone is grounds for a remand (see *Hudson v. Heckler*, 755 F.2d 781, 786 (11th Cir.1985)). And that is so even if Secretary can offer proper post hoc explanations for such unexplained conclusions. Any other approach would emasculate effective judicial review of ALJ decisions (*Owens*, 748 F.2d at 1516).

As for Williams' first contention of error, ALJ McLaughlin offered no explanation for his conclusion that Williams does not have impairments medically equal to those listed in 20 C.F.R. Subpart P, App. 1. As this Court noted in *Pearson v. Bowen*, 648 F.Supp. 782, 791 n. 23 (N.D.Ill.1986), an ALJ cannot simply list an applicant's impairments and then say in wholly conclusory fashion that there is no equivalence. Under Secretary's regulations the ALJ was required to determine whether Williams' impairments were, in combination, equivalent to any listed impairment. It is impossible to tell from his decision whether ALJ McLaughlin in fact made that determination or, if he did, how he made it.

Secretary insists ALJ McLaughlin was entitled to rely on medical reports in the record finding Williams' impairments were not equivalent to those in the listings (see, e.g., R. 96). That proposition itself is correct (see *Fox v. Heckler*, 776 F.2d 738, 740 (7th Cir.1985)), but it misses the point. Although the ALJ *could* legitimately have relied on such reports, it is impossible to tell from his decision whether he actually *did* do so.

ALJ McLaughlin's finding that Williams' only limitation on her ability to work is an inability to lift more than 50 pounds is equally unexplained. That conclusion is contradicted by his own analysis of the evidence, which discusses Dr. Uppuluri's evaluation. Dr. Uppuluri specifically found (1) Williams could lift a maximum of 40 pounds and (2) her ability to stand and walk might also be impaired. Apparently the ALJ rejected that evidence, but he does not explain why. As explained in *Zblewski v. Schweiker*, 732 F.2d 75, 78–79 (7th Cir. 1984):

> In the absence of an explicit and reasoned rejection of an entire line of evidence, the remaining evidence is "substantial" only when considered in isolation. It is more than merely helpful for the ALJ to articulate reasons (e.g., lack of credibility) for crediting or rejecting particular sources of evidence. It is absolutely essential for meaningful appellate review.

ALJ McLaughlin's unexplained finding in this area is critical, for it provides the basis for his step 4 determination that Williams' was still able to perform her past work.

It does appear likely that ALJ McLaughlin applied the correct legal standard and compared Williams' present physical abilities with the actual requirements of her past work (see *Strittmatter v. Schweiker*, 729 F.2d 507, 509 (7th Cir.1984)).[11] His decision, however, nowhere explains that required comparison. Again that omission makes it impossible to evaluate whether the ALJ's step 4 decision is supported by substantial evidence (*Hudson*, 755 F.2d at 786).

Finally, ALJ McLaughlin's decision to discredit Williams' subjective complaints and her own evaluation of her ability to work is simply not explained. When an ALJ rejects evidence that supports a claimant's position, he must articulate reasons for having done so (*Halvorsen v. Heckler*, 743 F.2d 1221, 1226–27 (7th Cir.1984)). Secretary now suggests the ALJ could have based such a decision on the fact Williams' proven impairments were not severe enough that they could reasonably have been expected to cause such pain (see

---

11. Findings 5, 6 and 7 of the decision suggest the ALJ used the proper analysis. However, because he nowhere explains his conclusions, it is impossible to say definitely whether he really did so.

*Sparks v. Bowen*, 807 F.2d 616, 618 (7th Cir.1986)), or he could simply have found Williams' complaints not credible (see *Bibbs v. Secretary of Health, Education and Welfare*, 626 F.2d 526, 528 (7th Cir. 1980)). True enough, the ALJ *might* have done either or both those things, but his decision does not *say* so.

Secretary cannot now remedy the ALJ's shortcomings by suggesting reasons for questioning Williams' credibility that ALJ McLaughlin himself did not give in his decision. After all, it is equally possible the ALJ rejected Williams' complaints because he found they were not fully supported by the medical evidence—and *that* would be an improper standard (*Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir.1984) (per curiam)).

This is not a case where conclusions flow automatically and effortlessly from the raw medical evidence. There is evidence in the record to support Williams' as well as Secretary's position. Evaluation of that evidence was essential to any rational conclusions, and that evaluation had to be included in the decision to facilitate effective judicial review (*Zblewski*, 732 F.2d at 78–79).[12]

Once more, speculation is not the stuff of which proper judicial review can be crafted.

Remand is necessary so ALJ McLaughlin can explain why he rejected Williams' subjective complaints.

### *Finding No. 5*

■ Even if this Court were to scour the record for unarticulated but plausible explanations or evidence to support the ALJ's findings, one of those findings clearly could not be supported by substantial evidence. ALJ McLaughlin specifically found Williams' only physical limitation was an inability to lift more than 50 pounds. That finding is not supported by substantial evidence in the record.[13]

ALJ McLaughlin had before him three doctors' assessments of Williams' ability to work.[14] One dated February 11, 1985 found Williams could lift up to 20 pounds occasionally and 10 pounds frequently (R. 272).[15] Dr. Uppuluri's assessment limited Williams to lifting 30–40 pounds occasionally and 20–30 pounds frequently (R. 372).[16] Dr. Patel, in his five-page summary of Williams' "chronic" problems (at least some of which would certainly appear to affect an individual's lifting capacity), specified no limitations on Williams' ability to lift (though he did put limitations on her ability to sit, climb, reach, push and pull).[17]

12. Not only is much of the ALJ's reasoning absent from his decision, but some of the analysis that he did see fit to share is questionable. He says Williams' heart problems have resolved and her June 1983 EKG was "normal." His own summary of the medical evidence, however, notes that the treadmill test given Williams at the same examination showed "possible peripheral vascular disease." ALJ McLaughlin also noted Williams had not "sought any continuing medical treatment" between December 1981 and April 1983. That statement is flatly contradicted by his own summary of the evidence. Dr. Elmes was treating Williams for her back pain on a regular basis from March 1982 until June 1984.

13. Secretary characterizes Finding 5 as a determination that Williams is capable of "medium work" as defined by Reg. §§ 404.1567(c) and 416.967(c), even though the ALJ did not label that finding as such. Any such classification would have no effect on this opinion, but it really has no place in a step 4 determination anyway: Step 4 requires an ALJ to compare an applicant's actual impairments against the actual requirements of her former type of work (*Pearson*, 648 F.Supp. at 791).

14. Several evaluations from Williams' earlier applications are also in the record (R. 232, 242). Those evaluations found Pearson could lift up to 50 pounds. But ALJ McLaughlin could not rationally have decided to credit those evaluations from 1983 and to discredit the later one in 1985. Logic dictates that the most recent assessments based on the most recent medical evidence (absent, of course, a finding that there are reasons to question the latter) should be given the greatest weight.

15. That evaluator's signature is illegible.

16. As n. 5 reflects, Dr. Uppuluri's assessment is probably based only on the effect of Williams' kidney problems and defers to Dr. Patel for further information. Again logic would suggest Williams' other medical problems might further impair her, but the ALJ found she could in fact do more than Dr. Uppuluri thought she could.

17. It is no more appropriate for this Court to play doctor than for an ALJ to do so (see n. 18). All the same, this aspect of Dr. Patel's report is certainly puzzling. In the form's space for an-

Apparently the ALJ decided to credit Dr. Patel's finding of no lifting limitation, while discrediting both the lifting limitations found by other doctors and the other limitations found by Dr. Patel. Such picking and choosing—a totally unexplained selectiveness—cannot provide substantial evidence for ALJ McLaughlin's finding[18] (*Bauzo*, 803 F.2d at 925).

Secretary argues that even if Finding 5 is incorrect, the ALJ's ultimate conclusion that Williams is still able to perform her past work is nevertheless supported by evidence in the record. In that respect Secretary points to a vocational evaluation dated March 4, 1985 (R. 121).

Again Secretary misses the point. Finding 5 (and not the vocational evaluation) was the specified basis for the ALJ's conclusion that Williams can still do her past work. If the premise falls, so must the conclusion. Once more Secretary asks this Court to engage in pure speculation. Secretary's decision cannot be affirmed on the basis of "might haves."

■ Finding 5's reversal does not, however, require an outright reversal of the ALJ's Finding 7 that Williams is still able to perform her past work. Instead a remand is appropriate, for Finding 7 might still be justified by the record despite the infirmity of Finding 5—a determination Secretary and not this Court must make.

On remand Secretary must determine Williams' actual physical limitations and then compare those findings to the requirements of her past work. If Secretary finds Williams cannot do her past work, a step 5 determination will be necessary.

### Dr. Patel's Assessment

■ ALJ McLaughlin's apparent reliance on Dr. Patel's assessment[19] is particularly troublesome in this case. Because Williams was not represented by counsel at the Hearing, the ALJ was obligated to conduct a careful examination of the evidence and explore for all the relevant facts (*Smith v. Secretary of Health, Education and Welfare*, 587 F.2d 857, 860–61 (7th Cir.1978) (per curiam)). At a minimum that called for the ALJ to inquire into the almost certainly inconsistent aspects of Dr. Patel's report outlined in n. 17. Yet instead of asking Dr. Patel for clarification, ALJ McLaughlin relied on the "x" in the no-lifting-limitation box and ignored the detailed accompanying report.

That violates the ALJ's duty as expressed in *Smith*, and of itself it calls for remand under that case (587 F.2d at 860). On remand ALJ McLaughlin should remedy that lapse.[20]

swering "Are LIFTING/CARRYING affected by impairment?" he checked the box for a "no" answer. Yet under the corresponding space for "What are the medical findings that support this assessment?" Dr. Patel inserted the handwritten entry "See attached Medical Report." Of course, a finding of *no* limitation would normally require no supplementary explanation in a medical report, while a finding of *some* limitation would always call for explanation. But even apart from that possible inconsistency, nothing in the lengthy report addresses Williams' ability to lift or carry objects, while at least two of the problems described and discussed by Dr. Patel would strongly suggest the existing of limiting factors:

    1. In the section on chest pains and angina, the report directly linked those frequently-experienced symptoms with exertion on Williams' part.
    2. In the section on increasingly severe back (as well as other) pains, the report deals with the kind of difficulty that typically is impacted by the need to do lifting and carrying.

Withal, this Court will not essay to explain the apparent disparities. Suffice it to say (as the text reflects) the ALJ did not handle the issue properly.

18. ALJ McLaughlin himself was not qualified to make his own assessment based on the medical evidence (*id.* at 926).

19. "Apparent" is a word this opinion has had to use all too often. Indeed, that very usage is compelled by (and reflective of) the inadequacy of ALJ McLaughlin's analysis and of any explanations for his findings.

20. Two record references mention hospital stays by Williams for which there are no medical records. Dr. Patel refers to a 1983 hospitalization (R. 377) (see n. 4), and Williams himself notified ALJ McLaughlin that she was hospitalized in February 1986 (R. 371). Although the latter hospital stay occurred after the Hearing, the ALJ knew about it before issuing his decision and really should have obtained any medical records and made them part of the record.

*Conclusion*

Because the ALJ has not adequately explained the reasons for his findings, this Court has found it impossible to determine whether they are, in their entirety, contrary to law or based on substantial evidence. One thing is plain: There is no rational basis in the record for the ALJ's Finding 5 that Williams' only physical limitation is an inability to lift more than 50 pounds. But as already explained, that is not dispositive of the issue.

Accordingly, both parties' motions for summary judgment must be and are denied. This case is remanded to Secretary for (1) a studied determination as to Williams' physical limitations and (2) the preparation of an adequately explained decision suitable for judicial review.[21]

On remand ALJ McLaughlin should obtain those records and consider them before rendering his decision.

21. Remands of disability cases occasioned by an ALJ's flawed handling are often accompanied by a direction for reassignment to another ALJ.

In this instance, however, ALJ McLaughlin has obviously *reviewed* the evidence in detail and has the advantage of having seen and heard Williams' testimony in person. This Court will therefore not *require* reassignment, leaving the decision on that score to Secretary.