Lampton EVANS, Plaintiff,

v.

Otis BOWEN, Secretary of Health and Human Services, Defendant.

No. 87 C 4346.

United States District Court, N.D. Illinois, E.D.

Dec. 22, 1987.

Sally A. Stix, Chicago, Ill., for plaintiff.

Anton R. Valukas, U.S. Atty., James J. Kubik, Asst. U.S. Atty., Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Lampton Evans ("Evans") seeks judicial review of a final decision of the Secretary of Health and Human Services ("Secretary") denying Evans' claim for disability insurance and supplemental security income ("SSI") benefits under Social Security Act ("Act") §§ 216(i), 223 and 1602, 42 U.S. C. §§ 416(i), 423 and 1381a.[1] After a July 17, 1986 hearing (the "Hearing"), Administrative Law Judge ("ALJ") George Bowman, Jr. denied Evans' application on August 12, 1986. Evans then exhausted his administrative remedies in proper sequence and brought this action pursuant to Section 405(g).

Evans and Secretary have now filed cross-motions for summary judgment. For the reasons stated in this memorandum opinion and order, Evans' motion is denied and Secretary's is granted.

### Facts

Evans, 48 years old at the time of the Hearing, has an eighth-grade education.[2] His employment history consists primarily of his nearly 14 years as a garage attendant ("car hiker") from 1966 to 1980 (R. 27, 82). For roughly the last three years of that period, Evans worked two separate full-time jobs, five days a week (R. 87). Evans' working days came to an abrupt end on January 4, 1980, when he was taken from work by ambulance to Northwestern Memorial Hospital complaining of chest pain. He has not worked since.

Evans first applied for disability insurance and SSI in February 1980, stating "heart attack, arthritis" (R. 57) as his disabilities. His applications were denied by the initial examiners and on reconsideration, and Evans requested an ALJ hearing. After such a hearing in which Evans was unrepresented—although "fully advised of his right to counsel" (R. 140)—on June 17, 1981 ALJ Charles Walsh denied Evans all benefits. Because ALJ Walsh decided Evans had the residual functional capacity to do sedentary work, he was found not disabled under the Secretary's regulations (of which more in a moment). ALJ Walsh's decision was denied review by the Appeals Council, and there is no indication that Evans sought judicial review.

In November 1985 Evans initiated his second set of applications for benefits, the subject of this opinion. Evans identified his disabling conditions as "coronary disease, diabetic, arthritis in shoulders, hips, & back" (R. 148). On February 11, 1986 Evans' application was denied because he was found capable of returning to his previous job as a garage attendant (R. 162, 192). Evans' request for reconsideration was denied May 19, 1986 on the same ground (R. 166, 190).

Evans then exercised his right to the ALJ Hearing, where he appeared without an attorney (this opinion will later deal with the significance of Evans' self-representation) He was the only witness in the Hearing, which lasted just over an hour. Evans was questioned at some length by ALJ Bowman, who also reviewed with Evans much of the medical evidence in the record. This opinion will later discuss the substance of the Hearing—Evans' testimony and ALJ Bowman's conduct.

ALJ Bowman had before him Evans' medical records dating back to January

---

1. All further citations to Act provisions will take the form "Section—," referring to the Title 42 numbering rather than to the Act's internal numbering. Regulations drawn from 20 C.F.R. will be cited "Reg. § —."

2. At times Evans has claimed his education stopped at the fifth-grade level (R. 74). But at the Hearing he said he completed the eighth grade (R. 27), the version ALJ Bowman factored into his decision. Nothing flows from that choice.

1980: reports from two treating physicians and a number of consulting physicians, plus records from at least some of Evans' periods of hospitalization. Given the nature of this kind of case and this Court's role as a reviewing court, a summary of that medical evidence is necessary.[3]

Evans was hospitalized at Northwestern Memorial Hospital from January 4 to 6, 1980 (R. 198), with a final primary diagnosis of chest pain and secondary diagnoses of obesity and hypertension (*id.*). Evans' hospitalization summary stated he had "new onset angina" (chest pain) and it was unlikely he had suffered a myocardial infarction (heart attack) (R. 209). Evans' electrocardiogram ("EKG") taken then was later interpreted (by a consulting doctor in 1985) to have shown some abnormality, described as "occasional P.V.C." (premature ventricular contractions) (R. 226).

Evans' chronic obesity should be noted at this point. His reported weight fluctuated between 280 (R. 80) and 312 pounds (R. 125) during the period covered by the medical records in this case. At the Hearing Evans said he weighed about 270 pounds (R. 24). Notations of his height also vary in the record from 5' 8" (R. 243) to 5' 11" (R. 256). At the Hearing Evans said he was 5' 11-½" tall (R. 24). One doctor who examined Evans when he weighed 312 pounds said (R. 128):

> The patient is grossly obese with his total body weight being greater than 100% increased.

At the end of January 1980 Evans was again hospitalized with a complaint of chest pains, this time at St. Mary's Hospital. Again the final diagnosis was angina and hypertension (R. 107). St. Mary's records also report on some of the earlier testing done at Northwestern, showing Evans' cardiac enzymatic studies and EKG were normal (R. 113). X-rays at St. Mary's revealed an "essentially normal chest" (R. 110).

During the St. Mary's hospitalization Evans underwent his first stress test to investigate heart disease. It revealed "no significant ischemic ST–T segment changes" (a measure of heart abnormality on an EKG) (R. 93). Evans was found to have only a fair exercise tolerance, but no chest pain was precipitated. Dr. Motto found Evans had a functional aerobic impairment ("FAI") of 35%, but the measurement was not reliable given his obesity.

Evans returned to the St. Mary's emergency room on March 27, 1980 with chest pain (R. 116). Evans left a few hours later after an EKG indicated "no acute changes" (R. 120). On June 30, 1980 Evans underwent his first examination by a consulting physician, S. Shroff. Dr. Shroff found no history of a heart attack and concluded Evans was suffering from hypertension, severe exogenous obesity and chest pain atypical for angina (R. 121).[4] Dr. Shroff then suggested Evans' complains would ameliorate with weight loss (*id.*).

Next appearing in the record is a physical capabilities evaluation from July 30, 1980[5] by a doctor with an illegible signature. Doctor—found Evans had the capacity to perform light work (i.e., standing/walking at least six hours per day), though the basis for this conclusion is not noted (R. 122).

Evans was then examined on March 30, 1981 by Dr. Robert Carbone ("Carbone"), who submitted a detailed consulting report on April 6, 1981. Dr. Carbone found no

---

3. Whether or not the legal career choice made by judges and their law clerks has involved a deliberate eschewal of a medical education, social security cases often send them "scurrying to the dictionaries" (*Sparks v. Bowen,* 807 F.2d 616, 617 (7th Cir.1986)). If the ALJ has not defined medical terms crucial to the case in his decision, litigants seeking judicial review would be well advised to do so (as was not done here). Fortunately this case offered few real difficulties in that respect.

4. Dr. Shroff cryptically follows his comment as to Evans' chest pain with "c/o coronary artery disease." This Court cannot unlock the abbreviation "c/o" with any assurance (perhaps it stands for "complains of"?), but in any event the thrust of Dr. Shroff's report would not suggest he had found such disease.

5. Although the index submitted as part of the record listed this evaluation as submitted 7/30/86, that date makes no sense (the evaluation was part of the material used by ALJ Walsh in his *1981* decision).

"thrills, rubs or clicks . . . [or] murmurs" in the heart sounds (R. 126). As for Evans' complaints of arthritis, Carbone found no swelling or deformities, with a full range of motion in all the joints of the upper extremities without pain and in the joints of the lower extremities with mild pain only in some manipulation of the hip joints (R. 127). Under the section labeled "Impression" Dr. Carbone reached several conclusions (R. 127–28):

1. Evans' hypertension was well controlled with no indication of end organ damage. It imposed no significant limitations on his functions.

2. Dr. Carbone identified two types of chest pain in Evans, one likely musculoskeletal and one that could well be ischemic in origin.[6] That diagnosis was based in part on the medications Evans was taking (i.e., nitroglycerin) that were indicative of heart disease. Evans' chest x-ray was normal (R. 136). Dr. Carbone felt a stress test was contraindicated because of Evans' weight. Dr. Carbone concluded Evans' chest pain did create a significant impairment of function.

3. Dr. Carbone found no objective evidence to indicate significant arthritis (though an x-ray (R. 136) revealed minimal osteoarthritis at the cervical 4 and 5 level). Evans' arthritis did not significantly limit his ability to function.

4. Dr. Carbone found Evans was suffering from "morbid obesity" although he could move well. His obesity did not limit Evans' functions.

Those clinical findings must also be considered in light of a physical capacities evaluation Dr. Carbone completed contemporaneously. He found Evans could sit eight hours and stand or walk two hours in an eight hour work day (R. 137). Dr. Carbone concluded Evans could frequently lift up to ten pounds and occasionally lift up to 50 (id.).

Evans' medical records continue for the period after his first ALJ hearing. Dr. Herman Neal, who had been Evans' treating physician until 1982, submitted a written evaluation dated December 3, 1985 (R. 193–97), though reflecting a last examination in July 1982. Dr. Neal's cardiac report diagnosed angina and hypertension (R. 193). Evans' heart size was normal, as were stress and resting EKGs and an angiography. Dr. Neal made no comment as to Evans' ability to do work-related activities. Dr. Neal's "Arthritic Report" said Evans made no complaints of arthritis as of his last examination in 1982 (R. 195). On the diabetes report (R. 197) Dr. Neal reported Evans' compliance with insulin therapy was good and there was no evidence of neuropathy (abnormality of motor functions); again Dr. Neal made no comment as to Evans' ability to do work-related activities.

On December 30, 1985 Evans was given a 25–minute examination by Dr. Kuang-Jyh Chen. Dr. Chen's January 6, 1986 report of that examination found no evidence of congestive heart failure and no abnormality in Evans' heart rhythm or sounds (R. 244). Dr. Chen found a normal range of motion in Evans' joints (id.) and no evidence of end organ damage from diabetes (R. 245). Evans' contemporaneous radiology exam found him to have a normal size heart but a "prominent aortic arch" (R. 246).

On the same date (December 30, 1985) Evans also took a second stress test, which was discontinued after three minutes because of fatigue (R. 247). No heart rhythm abnormalities were found, though Evans' functional aerobic capacity was 40% of that predicted, suggesting "marked" impairment of exercise tolerance (id.). Those test results were later interpreted to be negative at the exercise level of "5 METS" (R. 242).

Evans' record also contains two residual functional capacity assessments by Dr. Paul LaFata. On January 28, 1986 Dr. LaFata concluded Evans could sit, stand or walk about six hours of an eight hour day and frequently lift or carry 25 pounds (R. 248). Dr. LaFata's report does not reveal whether it was based on a physical exam or merely a review of records. Dr. LaFata

6. Ischemic heart disease is a condition "characterized by deficient blood supply to the heart muscles" (Morton, *Medical Proof of Social Security Disability* 473 (1983)).

did acknowledge Evans' allegations of chest pain consistent with ischemic heart disease but assumed there was no evidence of congestive heart failure and that Evans' stress test was negative (R. 249). On May 7, 1986 Dr. LaFata submitted an identical residual functional capacity assessment (R. 250–51). Based on that report, a vocational assessment found Evans could perform medium work without climbing and could return to his past job, which was classified as light exertional (R. 176).

Finally, the record contains a set of forms (R. 256–60) completed by Evans' current treating physician, Dr. Audley Mamby, and submitted to ALJ Bowman at the Hearing. Those forms were apparently completed on June 3 or June 6, 1986,[7] with Dr. Mamby having last examined Evans on June 3.

Dr. Mamby did not go into great detail on the forms. His Cardiac Report stated current diagnoses of (1) diabetes, (2) hypertension, (3) coronary artery disease and (4) obesity (R. 256). Dr. Mamby reported Evans had not suffered a myocardial infarction and said he did not know whether Evans had experienced congestive heart failure (id.). Evans' chest pain was described as "burning, squeezing pre-cordial [over the heart] pain" which lasted less than 15 minutes, occurred twice daily, was relieved by rest and nitroglycerin and could be precipitated by emotional upset, working (physical), lifting or carrying and cold air (R. 256–57). Dr. Mamby reported Evans' chest x-rays revealed arteriosclerotic changes of the aorta and cardiomegaly (enlargement of the heart) (R. 257, see also radiology report, R. 261). Dr. Mamby's cardiac analysis concluded with an assessment of Evans' "ability to do work-related activities" (id.):

Because of obesity—arthritis—exertional SOB [shortness of breath]—marked limitation.

Dr. Mamby's Diabetic Report diagnosed Evans as having diabetes mellitus since 1980 (R. 258). Evans' compliance with insulin therapy was good. There were no vascular complications, though the doctor found "mild peripheral neuropathy—both legs" (id.). Dr. Mamby's comments as to Evans' work impairment was simply "as stated" (id.). On the arthritis report (R. 259–60), Dr. Mamby reported "degenerative arthritis—lumbar spine—hips—shoulders" but no anatomical deformities or clinical abnormalities (R. 259). Degenerative changes of the dorsal spine were indicated in the accompanying radiology report (R. 261). Dr. Mamby described a functional abnormality of weakness but no significant loss of joint motion and normal ambulation (R. 260). Evans' work ability was described as "limited because of obesity and SOB" (id.).

*Applying the Statutory Framework*

To establish entitlement to disability benefits a claimant must show he is "disabled." Sections 416(i)(1) and 423(d) define "disability" as:

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ... which has lasted or can be expected to last for a continuous period of not less than 12 months....

Secretary has promulgated extensive procedural regulations for determining whether an applicant is disabled. *Garfield v. Schweiker,* 732 F.2d 605, 607 n. 2 (7th Cir.1984) summarizes Secretary's five-step test for determining "disability":

The following steps are addressed in order. (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3,

7. Although the forms were dated 6/3/86, they contain references to x-rays of Evans on 6/6/86

(R. 257).

stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. § 404.1520 (1983).[8]

Once a claimant has demonstrated an impairment of sufficient severity to prevail at step 4, *Smith v. Schweiker*, 735 F.2d 267, 270 (7th Cir.1984) teaches:

The burden then shift[s] to the agency to show the claimant retained the residual functional capacity to perform other work in the national economy.

At the fifth and final step Secretary must consider all the claimant's physical and mental impairments (Reg. § 404.1561), the claimant's age (Reg. § 404.1563), education (Reg. § 404.1564) and work experience (Regs. §§ 404.1565 and .1568). Toward that end Secretary typically looks to the "Grid," medical-vocational guidelines (found at 20 C.F.R. Subpart P, App. 2) that balance the claimant's physical limitations against other relevant factors (Reg. § 404.1569). Before doing so, Secretary must determine what type of work a claimant is capable of in light of his impairments. Secretary's regulations define types of work using physical exertion criteria (Reg. § 404.1567). Alternatively Secretary may base the step 5 determination on other evidence, including the assessment of a vocational specialist (Reg. § 404.1566(e)).

Secretary's decision must be upheld unless (1) the findings are not supported by substantial evidence or (2) Secretary has applied incorrect legal standards (Section 405(g)). *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938), defines "substantial evidence" as:

such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

## Secretary's Decision

After explaining the five-step disability test, ALJ Bowman proceeded to summarize the evidence in terms of each of Evans' ailments. Then the ALJ concluded that "considering the claimant's impairments individually and in combination," Evans remained capable of performing sedentary work as defined in Secretary's regulations (R. 12). ALJ Bowman found Evans' own description of his functional capacities at the Hearing compatible with that conclusion (*id.*). But the ALJ put greater stress on the medical evidence, which he said did not contain evidence that Evans was unable to perform sedentary work (*id.*). As to Evans' chest pain the ALJ stated (*id.*):

The claimant does have chest pain but the testing is rather inconclusive and certainly it does not show the presence of an underlying disabling condition.

These findings followed (R. 13):

3. The medical evidence establishes that the claimant has arthritis, diabetes, hypertension, history of angina, and obesity, but that he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4. The claimant's testimony regarding symptoms and functional limitations was not incredible, but his description was also not incompatible with the ultimate finding concerning his residual functional capacity.

5. The claimant has the residual functional capacity to perform the physical exertion requirements of work except for "light" and heavier lifting and carrying, and frequent standing and walking. There are no nonexertional limitations (20 CFR 404.1545 and 416.945).

6. The claimant is unable to perform his past relevant work as car hiker.

8. [Footnote by this Court] As of the date of the Hearing *Johnson v. Heckler*, 769 F.2d 1202, 1209–13 (7th Cir.1985) had invalidated step 2. ALJ Bowman therefore did not use that step when evaluating Evans' alleged disability (R. 13). Since then *Bowen v. Yuckert*, — U.S. —, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987) has upheld the validity of step 2, reversing a Ninth Circuit decision that had reached the same result as *Johnson*. On June 16, 1987 the Supreme Court therefore vacated and remanded *Johnson*, — U.S. —, 107 S.Ct. 3202, 96 L.Ed.2d 690. Because this opinion concludes benefits were correctly denied even without the step 2 evaluation, the omission of that step is immaterial.

7. The claimant has the residual functional capacity to perform the full range of sedentary work (20 CFR 404.1567 and 416.967).

8. The claimant is 48 years old, which is defined as a younger individual (20 CFR 404.1563 and 416.963).

9. The claimant has a limited education (20 CFR 404.1564 and 416.964).

10. In view of the claimant's age and residual functional capacity, the issue of transferability of work skills is not material.

ALJ Bowman then plugged those findings into the Grid[9] to find Evans not disabled. When the Appeals Council declined to review the ALJ's decision (R. 3), it became Secretary's final decision on Evans.

### Evans' Arguments

Evans challenges the decision in two ways:

1. He was denied a fair hearing before ALJ Bowman because he was unassisted by counsel and the ALJ failed to fulfill his obligation to develop a full and fair record at the Hearing.

2. ALJ Bowman's decision to deny disability benefits is not supported by substantial evidence.

On the first point, Evans asserts he was prejudiced by the ALJ's bias, mischaracterization of the evidence at the Hearing and failure to probe for all the evidence favorable to Evans' claim. On the second front, Evans maintains the ALJ improperly (1) discounted the medical evidence from the treating physician (Dr. Mamby) in favor of consulting doctors' reports, (2) failed to give adequate weight to Evans' testimony about pain and (3) failed to order additional testing of Evans to resolve inconclusive evidence in the record.

Neither of Evans' attacks succeeds. Although ALJ Bowman's conduct in the Hearing and his decision were less than perfect, the ultimate conclusion that Evans is not disabled must be upheld.

### Full and Fair Hearing

Beyond question an ALJ has an obligation to develop a full and fair record at a hearing when a claimant is unassisted by counsel (*Cannon v. Harris*, 651 F.2d 513, 519 (7th Cir.1981)). In that situation the ALJ should probe "scrupulously and conscientiously" (*id.; Williams v. Bowen*, 664 F.Supp. 1200, 1209 (N.D.Ill.1987)) so all relevant facts—favorable as well as unfavorable to the claimant—become part of the record (*Thompson v. Schweiker*, 665 F.2d 936, 941 (9th Cir.1982)). Some cases further suggest that when the claimant has not validly waived his or her right to be accompanied by counsel, the ALJ has a heightened duty to assure the claimant a fair hearing (see *Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir.1982); *Hawwat v. Heckler*, 608 F.Supp. 106, 108–09 (N.D.Ill. 1984)).[10] Even when judged by that higher standard, Evans' hearing before ALJ Bowman was fair.

This Court has necessarily reviewed the record as a whole not only to apply the "substantial evidence" test (dealt with in the next section of this opinion) but also to see whether the ALJ probed sufficiently, during the Hearing, for evidence favorable to Evans. In the latter respect, the record reveals this:

1. ALJ Bowman reviewed with Evans several of the medical reports in evi-

---

**9.** ALJ Bowman did not need to find whether Evans had transferable work skills, because even without transferable work skills the conclusion under the Grid is that Evans is not disabled.

**10.** Those cases hold a claimant who decides to forego the assistance of counsel at a hearing must be told free counsel may be available and that in any event attorney's fees are limited to 75% of any award (*id.*). Evans was not given that information before he agreed to proceed

without counsel in a very brief colloquy with ALJ Bowman (R. 19). Secretary Mem. 4–5 argues Evans' apparent representation by counsel in his earlier application meant he made an informed decision at the Hearing to proceed pro se. Evans R. Mem. 2 is correct, however, that his prior contacts with counsel shed no light on whether he waived counsel this time with knowledge of the availability of low-cost representation. This opinion therefore assumes Evans did not make a "valid" waiver.

dence—specifically those by Doctors Chen and Mamby (R. 33–37).[11]

2. In addition, the ALJ reviewed the results of Evans' two stress tests (R. 31, 32).

3. ALJ Bowman also questioned Evans about his present physical capabilities—how long he could walk, stand and sit, and his lifting/carrying ability (R. 37–39).

4. Extended questioning dealt with Evans' daily routine and other activities (R. 43–50).

5. ALJ Bowman asked Evans about his current chest pain and the effectiveness of nitroglycerin treatments (R. 39–40).

6. In addition, the ALJ reviewed with Evans the array of medications he was then taking (R. 40–42).

7. Finally, ALJ Bowman gave Evans an opportunity to add "anything further that you might want to tell me about that I haven't covered" (R. 51).

Evans has objected that ALJ Bowman mischaracterized the evidence at several points during the Hearing. That contention must be rejected for two reasons.

First, a comparison of the Hearing transcript with the underlying medical evidence reveals no unfairness in the ALJ's summarization. For example, Evans Mem. 7–8 claims the ALJ misstated Dr. Mamby's basis for concluding Evans' work capacity is impaired. But the document itself—Dr. Mamby's Arthritic Report on Evans (R. 259–60)—reveals the doctor based Evans' restrictions on his obesity and shortness of breath. ALJ Bowman's statement that Evans' weight was "apparently the main reason" (R. 37) for his work impairment is certainly a fair characterization of that evidence.

More importantly, this Court's review of the ALJ's decision looks not to his on-the-spot assessment of evidence but rather to his complete consideration of the evidence in the decision itself. As long as the Hearing as a whole did not fail to add to the record all available evidence favorable to Evans, any misinterpretation of individual pieces of evidence during the Hearing itself can be later cured by the ALJ. This Court must determine whether the ALJ's *ultimate* review of the evidence misinterpreted any evidence, thereby undermining the basis for his decision. As discussed more fully in the next section of this opinion, that did not take place.

Undoubtedly there are troubling aspects to some of ALJ Bowman's comments and questions in the Hearing. He criticized Evans for his choice of diet at two separate points in the Hearing (R. 31, 44),[12] and he questioned whether Evans had been "goofing off" in his second stress test by stopping after three minutes due to fatigue (R. 32). At other points the ALJ questioned the medical advice Evans had received, expressing surprise that Evans was prescribed nitroglycerin pads without evidence of heart disease (R. 40) and disagreeing with one doctor's advice, represented orally by Evans, that Evans should stop working (R. 32). ALJ Bowman also made frequent comments as to Evans' weight and the need to diet to address his health problems (R. 25, 53).

Prejudicial or unwarranted comments by an ALJ may indeed reflect bias or other good cause for a remand for a new hearing (see *Perez v. Heckler,* 581 F.Supp. 1095, 1102–03 (N.D.Ind.1984)). But that must be because those things betoken the absence of a fair hearing. And in that respect, so long as all the evidence favorable to Evans was in fact adduced and fairly considered

**11.** One report ALJ Bowman did not refer to in the Hearing was the consulting report of Dr. Carbone, which concluded Evans' ability to function was limited by ischemic heart disease (R. 128) but he was still capable of performing sedentary-level work (R. 137). That report, part of the record at Evans' first ALJ hearing, was not submitted into evidence at the Hearing. However, ALJ Bowman did review the Dr. Carbone report and incorporated its finding in his own decision (R. 12). No fatal defect can be ascribed to Evans' not having an opportunity to comment on or emphasize that report.

**12.** This Court has often commented it is not the ALJ's province to play amateur doctor (see *Lundquist v. Heckler,* 670 F.Supp. 781, 785 (N.D. Ill.1985). Here we have an ALJ instead playing amateur dietician.

by the ALJ en route to his reaching an adverse decision based on other substantial evidence, the fair-hearing test has been met.

In this instance, whatever statements the ALJ made did not—as this opinion has already pointed out—impair the production of a full and fair record in the Hearing. Nor was the Hearing somehow tainted by ALJ Bowman's other statements suggesting he had already arrived at many of the ultimate findings in the case.[13] Such comments should occasion reversal or remand only if they led to a decision reflecting impermissible bias or unsupported by substantial evidence. As the ensuing discussion makes clear, the conclusions reached by ALJ Bowman had a more than adequate foundation.

### Substantial Evidence

■ As said earlier, this Court's role in reviewing Secretary's decision calls for affirmance if the supporting evidence is such as "a reasonable mind might accept as adequate" (*Richardson*, 402 U.S. at 401, 91 S.Ct. at 1427). This opinion's unusually detailed initial presentation of the medical evidence has thus served a dual function. It has also shown the wealth of evidence supporting the ALJ's conclusion that Evans remained capable of performing sedentary work. Indeed, it would be difficult to identify *any* evidence to support a contrary finding, given the "sedentary work" definition (Reg. § 404.1567):

> *Sedentary work.* Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

### 1. Physicians' Opinions

Evans Mem. 11–12 claims the ALJ rejected evidence from treating physician Dr. Mamby in favor of the evidence presented by consulting physicians. Though our Court of Appeals has given mixed signals in this area, even its decisions tending to give greater credence to the latter (see, e.g., *Stephens v. Heckler*, 766 F.2d 284, 288–89 (7th Cir.1985)) acknowledge the findings by a treating doctor are often of greater value in a disability determination and cannot be discounted by an ALJ without valid grounds.[14] But Evans' argument on this score can be dismissed for two simple and related reasons:

1. ALJ Bowman did not improperly discount Dr. Mamby's findings.

2. Dr. Mamby's report does not conflict with the ALJ's decision.

As for the first point, the ALJ's decision accepted Dr. Mamby's clinical findings and did not challenge Dr. Mamby's description of Evans' limitations. Thus ALJ Bowman accepted Dr. Mamby's report that examinations revealed Evans to have a condition of cardiomegaly and arteriosclerotic changes of the aorta (R. 12). Similarly, the ALJ also noted that Evans' x-rays, referred to in Dr. Mamby's report, show degenerative changes of the dorsal spine (R. 12) and also accepted Dr. Mamby's description of Evans' work-related limitations (noted in the ALJ's discussion of Evans' diabetes, R. 10). To be sure, the ALJ questioned Dr. Mamby's diagnosis that Evans had coronary artery disease because Dr. Mamby failed to

---

**13.** At one point the ALJ said Evans could still perform work of a sedentary nature (R. 33) and he should consider seeking some vocational rehabilitation (R. 50–51). Toward the end of the Hearing the ALJ also said (R. 52):

> I think we can verify at the present time through the new material and exhibits that we have here that you do have a condition of coronary artery disease. It is not severe but you do have it.

Those statements, as well as those already adverted to in the text, may profitably be contrasted with the ALJ comments that led to remand in *Perez.*

**14.** There are of course legitimate bases to discount a treating physician's report, such as the absence of supporting clinical evidence for a conclusion (see *Smith v. Bowen*, No. 87 C 1627, slip op. at 8 (N.D.Ill. Oct. 28, 1987) [Available on WESTLAW, 1987 WL 19152] and cases cited there).

show "a definite basis for this diagnosis" (R. 11), and the ALJ thus did not include coronary artery disease among Evans' ailments in Finding No. 3 (R. 13). However, it does not appear from the decision that the ALJ's rejection of that diagnosis played a role in the ALJ's ultimate decision.[15] Because Dr. Mamby's report as a whole is consistent with the ALJ's decision, the ALJ's potential discounting of a portion of Dr. Mamby's report does not affect the decision's validity.

In the second place, Dr. Mamby's report does not undermine the ALJ's conclusion that Evans could do sedentary work. Dr. Mamby's cardiac report concluded Evans had a "marked limitation" to do work (R. 257), but he did not at all say Evans was incapable of all gainful employment. That is much like the 1981 findings made by consultant Dr. Carbone, who then found Evans had a "significant limitation of function" (R. 128) but also explicitly found Evans capable of performing sedentary work (R. 137). It should also be remembered that Dr. Mamby's stated basis for concluding Evans had a marked limitation was "because of obesity—arthritis—exertional SOB [shortness of breath]" (R. 257). Dr. Mamby did *not* list coronary artery disease as one of the limiting factors. Thus ALJ Bowman's failure to find Evans was suffering from coronary artery disease cannot be said to conflict with a nonexistent conclusion by the treating physician that such disease was a limiting factor to be considered.

Evans' memoranda focus mainly on the question just dealt with: the ALJ's treatment of the evidence as to heart disease. As to all other factors—Evans' obesity, diabetes, hypertension and arthritis—the record overwhelmingly demonstrates Ev-

ans was capable of doing sedentary work despite those conditions.

As for Evans' hypertension and diabetes, a review of the evidence (cited quite thoroughly by the ALJ) shows those conditions were under control with treatment and were not creating any significant limitations on Evans' functions. As to Evans' arthritis, there were some clinical findings of degenerative changes (noted earlier), but the medical evidence uniformly reported Evans' mobility and use of his joints were not impaired. Finally as to Evans' weight problem, it is not certain Evans has yet conquered his obesity—despite his testimony of recent success (R. 25)—but the evidence indicates that does not impair his ability to function so as to rule out sedentary work.[16] In each of these four areas, Dr. Mamby's June 1986 report also supports the ALJ's conclusion.

### 2. Subjective Pain

Evans Mem. 12 asserts the ALJ discounted his testimony about the pain he was experiencing due to his heart troubles, arthritis and other conditions. On the contrary, the evidence and the ALJ's decision show he did not discount Evans' subjective complaints—instead the ALJ found the complaints of pain quite credible. What Evans has failed to recognize is that an ALJ has a two-step duty in that respect. First the ALJ must identify "medically determinable impairments that could reasonably produce ... pain," but then the ALJ must go on to decide whether that level of pain prevents the claimant from working (*Pearson v. Bowen,* 648 F.Supp. 782, 788 (N.D.Ill.1986); see also *Brown v. Bowen,* 801 F.2d 361, 362–63 (10th Cir.1986)). Evans passed the first hurdle, but he could not prove his pain was sufficiently disabling to prevent sedentary work.[17]

---

**15.** This Court's uncertainty about ALJ Bowman's precise reasoning process poses the question whether the ALJ sufficiently articulated his assessment of the evidence to allow the decision to be upheld (see, e.g., *Burnett v. Bowen,* 830 F.2d 731, 736 (7th Cir.1987)). But here a remand for a more detailed opinion is not called for because no sufficient "evidence is presented to counter the agency's position" (*id.*).

**16.** "Disability" may arguably be viewed as limited to factors over which a claimant has no control—and if so, obesity as a cause of compensable disability might be viewed askance. But in light of this opinion's resolution of the case and because Evans' weight is not now disabling in any event, that question need not be dealt with.

**17.** Evans' counsel appears to have overlooked an alternate argument that his pain was a non-

ALJ Bowman concurred that Evans was experiencing chest pain, but he concluded the condition was not disabling in light of the medical evidence. It is Secretary's role (through the ALJ) to assess the evidence on the effect of Evans' pain (cf. *Holndoner v. Schweiker*, 542 F.Supp. 739, 741 (N.D.Ill. 1982) (Secretary should resolve conflicts in the evidence)). Once again the ALJ's decision is fairly supported by the record. Evans' own description of his activities showed his ability to function despite the angina. There were several record references to the efficacy of medication to ameliorate Evans' pain (see, e.g., R. 257). Neither Dr. Mamby (R. 256) nor Dr. Carbone (R. 128, 137) cited Evans' angina as preventing any level of work altogether. Undoubtedly, Evans was experiencing chest pain on a regular basis—but not all pain is disabling.

### 3. Additional Testing

Evans' final argument is that ALJ Bowman should have ordered additional testing because the testing of Evans' heart condition was inconclusive. Evans R. Mem. 6 specifically points to the inconclusive results of the two stress tests as requiring a remand of the case for additional testing.

Case law, however, does not mandate an ALJ to order additional testing based simply on the inconclusive nature of certain evidence. Rather an ALJ is compelled to order additional examinations when, without such evidence, the ALJ cannot make an "informed choice" (*Conley v. Bowen*, 781 F.2d 143, 146 (8th Cir.1986) (per curiam); *Turner v. Califano*, 563 F.2d 669, 671 (5th Cir.1977) (per curiam)).

This opinion has already shown there was adequate evidence to demonstrate ALJ Bowman made an "informed choice." Additionally, no serious abnormality was uncovered in any of Evans' EKG tests. Moreover, the stress tests themselves were not so inconclusive as to prevent their use by the ALJ. Neither test disclosed any

rhythmic abnormality (R. 93, 247). Instead each simply reflected Evans' aerobic capacity was severely impaired. Finally, given Evans' continued weight problem (at least as of the date of the Hearing), it appears unlikely that any better stress test results could be obtained anyway.

In view of the overwhelming evidence that Evans' coronary condition is not disabling and that he remained capable of performing sedentary work, this Court is unwilling to remand the case for additional testing. Evans has failed to demonstrate the record evidence was insufficient to support the ALJ's conclusion. No remand is appropriate.

### Conclusion

ALJ Bowman's decision to deny Evans disability insurance and SSI benefits must be upheld. Evans received a fair hearing before the ALJ—unimpaired by the ALJ's now-challenged occasional comments during the Hearing—and the ALJ's conclusion is more than supported by substantial evidence.

There is no genuine issue as to any material (that is, outcome-determinative) fact, and Secretary is entitled to a judgment as a matter of law. This action is dismissed.

---

exertional impairment severe enough to bar use of the Grid to assess his disability (see *Walker v. Bowen*, 834 F.2d 635, 641 (7th Cir.1987); *Nelson v. Secretary of Health & Human Services*, 770 F.2d 682, 684–85 (7th Cir.1985) (per curiam)). Though it is not this Court's responsibility to

recast a party's allegations or to decide an issue the parties did not even intimate, the following paragraph in the text suggests this added argument would have been no more successful in any event.